UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:24-cr-10056-DJC |
| | ) | |
| ROBERT BULLOCK | ) | |

**Defendant's Sentencing Memorandum**

**I.      Introduction**

Robert "Bob" Bullock is a father, husband, and once proud employee of the town of
Stoughton, Massachusetts. Since the day Mr. Bullock made the terrible decision at the Stoughton
water department, November 29, 2022, he has felt the weight of that choice. Working for that
department was a job that became critical to his identity. He was so proud of becoming a
permanent employee that he had the department's seal tattooed on his calf to commemorate the
accomplishment. He has felt an immense sense of shame throughout this federal prosecution –
not from the indignity of the media attention which will forever attach to his name, but from his
actions in letting the citizens of his community down. As this case progressed, he lost his
beloved job, his children faced scrutiny and humiliation, his marriage became rocky, and his
mental health became shaken like never before. Mr. Bullock accepts full responsibility and is
prepared to begin to repair the harm he caused to the community in any way he can.

Mr. Bullock accepts that his actions were in violation of federal law. Rather than having
any desire to harm the public, Mr. Bullock made this impulsive choice after experiencing
workplace tensions and feeling fearful of being unfairly targeted for the quality of his work. He
never considered that his actions could have broader effects, and thankfully, the situation was

promptly addressed the following morning. An investigation showed no evidence of any actual

harm to any residents as a result of his actions: the approximately 40,000 gallons of

unchlorinated water was mixed with approximately 2 million gallons of properly chlorinated

water before distribution. PSR ¶ 17. This fact is not meant to minimize the risk to public water

supply; the public trust was breached by Mr. Bullock's actions, and that requires a serious

response. Mr. Bullock plainly recognizes the seriousness of his actions and how sharply his

behavior diverged from how he has conducted himself in his work for years. He thinks about his

actions every day.

Mr. Bullock valued his position as a water engineer with utmost pride. The feeling of

shame that he continues to experience based on his conduct in this case is palpable. He writes:

> Because of my actions on November 29, 2022, I could have
> compromised the safety of the drinking water. And I take
> responsibility for that and I alone. I let my community down.
> …I'd give anything to be able to take it all back. But I know I must
> own this, and I have no one to blame but myself. I struggle with that
> feeling every day and every night, for the past 574 days and nights,
> right up to and including this very moment…I am incredibly
> remorseful, embarrassed, sorry, and have been regretting this since
> it happened. I violated the water operator code of conduct. But I am
> owning my actions and take 100% of the blame, because it violated
> the sacred code of conduct for water operators.

Exhibit A.

Mr. Bullock accepted responsibility for his actions by pleading guilty to a violation of 42

U.S.C. § 300i-1, tampering with a public water system, pursuant to a Rule 11(c)(1)(B) plea

agreement in this case. The plea agreement caps the government's recommendation at 12

months, 1 day of custody, but does not require a sentence of incarceration. Based on the totality

of circumstances including the 3553(a) factors, Mr. Bullock's history and circumstances, and

consideration of the significant collateral consequences, a sentence of incarceration would be

greater than necessary to satisfy the statutory requirements. Here, a sentence of time-served, followed by a three-year term of supervised release with a period of home confinement is appropriate and justified.

## II.    Mr. Bullock's History and Circumstances

Mr. Bullock grew up in a loving home with parents who modeled a strong work ethic and the importance of close family relationships. He and his brother were surrounded by cousins, aunts and uncles in their community in Weymouth. His parents were hard working and took good care of Mr. Bullock and his brother. Mr. Bullock's younger brother had health issues as a child, and this led to bullying from time to time on the playground. Mr. Bullock always took on the role of the protector of his brother and stood up for him. Mr. Bullock's relationship with his father was a central focus throughout his childhood and into his adult years. He looked up to his father deeply and wanted his father to be proud of him.

After graduating with honors from Weymouth High School, Mr. Bullock went on to earn various licenses and certifications including his Commercial Driver's License and OSHA certifications. Mr. Bullock's adult life was defined, in large measure, by his work. He was a proud employee at the Stoughton Water and Sewer Department from 2012 up until 2023. Prior to working at the Stoughton water department, he worked at the Avon water department for over 15 years.

At Stoughton, he quickly rose through the ranks from water treatment operator to foreman, often volunteering for additional trainings and sometimes paying for these out of pocket if not covered by the employer. He cared about his work, cared about his community, and wanted to do a good job. He writes about his father:

> My dad was so happy for me when I got hired in Stoughton because

> he said he could see a clear difference in me. Especially, he said,
> when I talked about my job when I stopped by to check on them or
> to share a Sunday dinner. He always said that if you were lucky
> enough to be in a job that your thoroughly enjoyed then you'd never
> work a day in your life.

Exhibit A.

Mr. Bullock wholeheartedly believed in this principle, and when his probationary period ended at Stoughton, he proudly documented the achievement and his commitment with a water department tattoo on his calf. Simply put, he was in his dream job and felt proud to document it in this way. Over the years, as he became a foreman and accepted additional responsibilities at the water station, his sense of pride only grew. His family and friends were also aware of how important his work was to him.

At home, Mr. Bullock strove to be a good husband and father to his twin boys. He worked hard and tried to lead by example. He spent his free time being involved in what made his children happy, whether it was taking his children to early hockey practices or being a patient listener as they grew older and needed advice. His son writes:

> I was contacted by (Probation) from the court office to give a view
> of my dad and his life. We had a great conversation for an hour and
> a half about everything I could think of about him as a person. And
> at the end she asked me, to in general sum up what my dad meant to
> me. And it was all I could do to not cry thinking about what a totally
> caring and mentoring father he has always been to me and my
> brother. My dad has been such a mentor to me professionally for my
> whole life, I really don't think I would be anywhere near where I am
> right now without him.

Exhibit B.

In 2021, the year before this incident, Mr. Bullock lost his father, whom he looked up to his whole life, to the ravages of dementia. Mr. Bullock became unmoored. He continues to grieve the loss of his father and is only now putting the pieces together after beginning mental

4

health treatment. Mr. Bullock reflects:

> My dad was my hero and I lost him on January 20, 2021. I still
> haven't stopped grieving, I miss him so much. And, I know he would
> be sitting right here next to me in full support. Even though he'd
> surely be disappointed in me being involved in this. I'll feel his
> disappointment in me for the rest of my life.

Exhibit A. Unquestionably, Mr. Bullock's mental well-being was in a state of disarray at the time
of the offense.

### III.    Nature and Circumstances of the Offense

At the time of his criminal conduct, Mr. Bullock had been with the Stoughton water
department for nine years and took pride in making sure the job was done well, by him and by
other employees. About a month before the incident, things at work began to unravel. Mr.
Bullock was involved in a minor car accident at work in his work vehicle, which resulted in his
supervisor suspending some of his responsibilities while the circumstances of the accident were
investigated. This meant Mr. Bullock no longer had access to his work vehicle, which he used on
a daily basis to make rounds to the different water stations in Stoughton.

Around this time, Mr. Bullock heard rumors of grumblings by his co-workers and
supposed complaints about some of the work he had done, suggesting that he had been sloppy.
These difficulties with co-workers during this timeframe is documented in the PSR at ¶ 16. Mr.
Bullock resented the suggestion and felt a great deal of stress that his co-workers were
inaccurately assessing his work.

On November 29, 2022, his intention was to go to back to the water stations and check
his work, to make sure there was no validity to the comments made by his co-workers. While
there and perseverating on the situation, he made an impulsive decision to turn off a pump at one
water station, which halted the flow of chlorine into the system overnight. At no time did he have

any intent to harm the community of Stoughton.

The Stoughton water department realized the problem immediately thereafter the following morning, and quickly took steps to resolve it. The EPA investigated, but ultimately did not cite the water department. The investigation revealed no evidence of any harm to the community or intent to harm the community. But nevertheless, Mr. Bullock's actions were criminal in nature and now result in a federal felony conviction with many significant direct and collateral consequences.

### IV.    Advisory Guidelines, Plea Agreement, and Basis for Departures

Mr. Bullock accepted responsibility and pled guilty on March 26, 2025. PSR ¶¶ 2-3. The plea agreement in this case involves the dismissal of two counts and a plea to the remaining count of tampering with the public water system. Mr. Bullock has complied with all Court-ordered conditions since his release on March 7, 2024. *Id.* at ¶ 4. The plea agreement recommendation does not require a sentence of incarceration.

Mr. Bullock has no dispute with the PSR's mathematical guideline calculation outlined in the PSR at ¶¶ 22-31. However, the advisory guideline range fails to adequately capture the different ways the statute can be violated, as well as the circumstances of the present case.

The statute, 42 U.S.C. § 300i-1, defines the term "tamper" in two different ways:

> (1) to introduce a contaminant into a public water system with the intention of harming persons; or
> (2) to otherwise interfere with the operation of a public water system with the intention of harming persons.

42 U.S.C. § 300i-1(d).

The statute also defines "persons" in two different ways. The first is the common

6

definition of person – a human being ("individual" in the statute). The second is much broader and defines a "person" as a broad category including corporations, companies, states, and municipalities. 42 U.S.C. § 300(f)(12).

Because the statute defines "tamper" and "person" in two very different ways, it results in the equivalent of 4 different crimes. But the guideline fails to account for these broad differences. Instead, the guidelines provide the same base offense level for what is functionally four separate offenses. The guideline sets a base offense level of 26 unless the offense involved a threat or a threat with intent to carry out the threat. Any other conduct results in an offense level of 26.

The statute creates four crimes, which we list from most serious to least serious:

(1)     to introduce a contaminant into a public water system intending to harm human beings.
(2)     to otherwise interfere with the operation of a public water system intending to harm human beings.
(3)     to introduce a contaminant into a public water system intending to harm corporations companies, states, and municipalities.
(4)     to otherwise interfere with the operation of a public water system intending to harm corporations companies, states, and municipalities.

Among these four distinct crimes, Mr. Bullock's act supports the least serious section – "otherwise interfering" with the water system in a way that harmed the system itself or its reputation. Again, no human beings were harmed. The unchlorinated water entered into the public water system and was diluted by water that had been properly processed. While concerning and criminal, Mr. Bullock's specific act was not as harmful as other potential crimes encompassed by the guideline.

The parties' assessment of the facts and circumstances of the case led to the negotiated resolution proposing as a just sentence including a range of time from 12 months, 1 day (top end)

to time served in the government's view, to supervision in the community as argued here.

Additionally, the Court can note that Mr. Bullock's conduct and background meet the USSG criteria for a departure under Aberrant Behavior. The Aberrant Behavior policy statement provides a possible ground for departure when the following are present: (1) the offense was without significant planning; (2) was of limited duration; (3) "represents a marked deviations by the defendant from an otherwise law-abiding life." USSG § 5K2.20(b)

Mr. Bullock meets all three factors. He committed the offense itself impulsively and without forward planning, and the conduct was limited to a short period of time. Mr. Bullock has otherwise lived his life in a law-abiding manner. His worth ethic is at complete odds with the actions he took on that night.

Finally, a sentence of supervision in the community is consistent with the sentences imposed in other cases on record involving tampering with water supply. *See United States v. Travnicheck*, No. 21-CR-40029 (D. Kan. May 10, 2022) (3 years' probation and $2500 restitution); *United States v. Davis*, No. 10-CR-60309 (S.D. Fla. Jan. 12, 2012) (time-served of 8 months imprisonment, 3 years of supervised release, and $3500 restitution).[1]

### V. An Appropriate Sentence is a Non-Jail Sentence

Mr. Bullock plainly feels the weight of the crime he committed. Proper and adequate punishment for this crime can be accomplished by strict supervision in the community.

The Sentencing Guidelines no longer bind the Court and remain just one of many factors

---

[1] In *Travnicheck*, the defendant was a former employee who became angry with management after his resignation. He logged into the water system remotely and shut down the water facility. The duty operator noticed that one of the plant's filters had been turned off. When defendant was questioned about the events, he said he was so drunk he did not remember anything from that night. In *Davis*, the defendant was mentally ill and climbed over a fence to enter the water treatment plant; he turned off 3 main control breakers and went around the plant turning off the power and a backup generator.

that the court must consider in reaching a just sentence. *United States v. Booker*, 125 S.Ct. 738 (2005). Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing. The court must consider the kinds of sentences that are available, and how to "provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Rather than a formulaic or rigid approach, the statute requires broad analysis that considers the whole person, circumstances, and how to best support successful reentry into the community. The district court has wide latitude in making individualized sentencing determinations based on a holistic and flexible inquiry, grounded in the 3553(a) factors.

This Court has the power and responsibility to consider all the circumstances and to fashion a sentence that is in line with the individual before it. Here, a sentence of incarceration will serve to unnecessarily disrupt and destroy the progress Mr. Bullock has made while on pretrial release, including attention to his mental health. A period of incarceration is not required to deter him from further criminal activity or to drive home the point that his behavior was wrong and not in line with the values of our society. Nor is a sentence of confinement required to impart to others similarly situated to him that similar conduct will have lasting negative consequences, as Mr. Bullock has experienced several: federal arrest without warning with the attendant circumstances known to the Court; media infamy; and living under supervision of the Court. Instead, supervision in the community with any necessary period of home confinement will be a sufficient punishment to address the behavior, especially when considered along with these other significant collateral consequences of this conviction for Mr. Bullock.

9

A sentence that does not involve incarceration is still a serious sentence. The Court should not consider home confinement an insufficient punishment based on the circumstances in this case. The Supreme Court has recognized the serious nature of even a solely probationary sentence:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48-49 (2007). Supervised release will require certain limitations of Mr. Bullock's liberty. Mr. Bullock has demonstrated that he will be a good candidate for supervised release based on his performance on presentence release in this case. Incurring a federal felony record and being subject to a significant term of supervised release is a just and sufficient punishment, and certainly sufficient to deter Mr. Bullock– and others similarly situated – from committing such a crime in the future.

The Supreme Court also has recognized that imposing a term of incarceration in the name of promoting respect for the law in a case where a particular defendant's unique circumstances suggest a more moderate sentencing alternative actually could promote *disrespect* for the law:

> Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Id.*

10

There are many reasons why a sentence of incarceration in this case will result in a sentence that is "greater than necessary" to achieve the sentencing goals.

First, there are Mr. Bullock's acute mental health needs, which are described in detail in the PSR at ¶¶ 64-66.

Second, there are already significant collateral consequences that serve to justly "punish" Mr. Bullock. He has lost his beloved job after being a public servant dating back to 1996. PSR ¶¶ 71-72. The loss of position means a loss of income, livelihood, and potentially his pension. His work was his identity, and that has been shattered by his actions in this case. The publicity surrounding the charges means that people view him a certain way, and that Mr. Bullock perceives that change in how he is viewed. This reality has been very challenging for Mr. Bullock considering his personal background. Mr. Bullock faces additional consequences, including the loss of important civil liberties like his right to own a firearm, which also means losing access to some security-related employment that he has relied upon.

Third, Mr. Bullock has serious health concerns that will not be served adequately in a Bureau of Prisons, described more fully in the PSR at ¶¶ 56-63. Just two weeks ago, he was hospitalized following a collapse at his home and is still undergoing medical tests to determine the correct diagnosis.

A sentence of supervision in the community is a significant sentence for this defendant. Jail is not required or supported upon weighing of all the 3553(a) factors. Mr. Bullock knows full well that if he fails to comport with the requirements of supervision, he will return to court, and jail will be a likely consequence. He is motivated and capable of rehabilitation in the community.

### V.    Conclusion

For the foregoing reasons, Mr. Bullock requests a sentence of time-served, followed by a

three-year term of supervised release with a period of home confinement, and conditions of

supervision to include supports for mental health.

> Robert Bullock,
> By his attorney,
>
> Cara McNamara
> B.B.O .# 712096
> Federal Defender Office
> 51 Sleeper Street, 5th Floor
> Boston, MA 02210
> Tel: 617-223-8061

<u>CERTIFICATE OF SERVICE</u>

I, Cara McNamara, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 10, 2025.

> /s/ Cara McNamara
> Cara McNamara